## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 23 2019, 7:01 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Brian A. Karle
Ball Eggleston, PC
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Johnny Jones,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

December 23, 2019

Court of Appeals Case No.
19A-CR-1190

Appeal from the Marion Superior Court

The Honorable Shatrese M. Flowers, Judge

Trial Court Cause No.
49G02-1509-MR-31503

**Najam, Judge.**

# Statement of the Case

Johnny Jones appeals his convictions for murder, a felony, and rape, as a Class A felony, following a jury trial. Jones raises one issue for our review, namely, whether the trial court abused its discretion when it admitted evidence that his DNA had been found on swabs taken from the victim during an autopsy.

We affirm.

# Facts and Procedural History

On November 5, 1998, officers with the Indianapolis Police Department responded to a call regarding a house fire at the home of Kenya Edwards. When officers arrived, they observed that a window to a bedroom "had been broken out." Tr. Vol. II at 117. Once inside, officers saw "obvious signs of a struggle." *Id*. at 138. Officers then located Edwards' body in the basement, and they saw that "the majority of the upper part" of her body had been "burned off." *Id*. at 150. The officers also observed that Edwards was not wearing any pants and that she had electrical cords tied around her ankles.

The next day, the coroner performed an autopsy on Edwards. Doctor Thomas Sozio, a forensic pathologist, reviewed the coroner's report.[1] Dr. Sozio noted that Edwards "displayed areas of burns to the outside of her body" and that "[t]here was black soot that was present within the nose, mouth, [and] in the

---

[1] During the pendency of the case, the coroner suffered a stroke and is no longer able to communicate.

larynx," which told him "that she was alive when the fire was starting." Tr. Vol. III at 14, 16. He also noticed that "there were some ligatures around the ankles and wrist areas" where electrical cords "had been cut and tied." *Id*. Based on the injuries to Edwards' body, Dr. Sozio concluded that her death was a homicide.

[5] David Willoughby, the liaison between the Marion County Forensic Service Agency ("Crime Lab"), the police department, and the coroner, attended Edwards' autopsy. While there, Willoughby collected swabs from Edwards' mouth, vagina, and anus. Willoughby then packaged the swabs in envelopes and put his initials over the seals "to ensure that what [he] collected from the autopsy [wa]s what [wa]s contained inside the envelopes[.]" *Id.* at 2. Willoughby labeled the oral swabs as item M3, the vaginal swabs as item M5, and the anal swabs as item M7. Willoughby then placed all of the evidence that he had collected into the "property room," which is a sealed facility. *Id*.

[6] Sangeete Joshi, a serologist with the Crime Lab, then took those envelopes from the property room for analysis. The envelopes were "sealed" and "did not show any signs of tampering." *Id*. at 124. When she opened the envelopes, Joshi saw that each envelope contained four swabs, which she tested for semen. Joshi did not find semen on the oral swabs, but she found semen on the vaginal and anal swabs. Accordingly, Joshi prepared the samples to be analyzed by a DNA analyst. However, because there was no sample from a suspect for comparison, Joshi placed the samples into cold storage.

[7]     In 2009, Tonya Fishburn, a forensic scientist with the Crime Lab, took the vaginal and anal swabs that Joshi had prepared out of storage. Fishburn then extracted the DNA from the samples and separated it into epithelial fractions and sperm fractions. For the vaginal swabs, Fishburn was able to determine that the epithelial fraction matched the DNA profile for Edwards. She was also able to determine that the DNA for the sperm fraction was a mixture of a major contributor and a minor contributor. Fishburn concluded that the major contributor came from Unknown Male A and the minor contributor came from Edwards. Fishburn was also able to determine that the epithelial fraction of the DNA from the anal swabs matched Edwards' DNA profile and that the DNA from the sperm fraction was a mixture of a major and minor contributor. For that sample, the DNA profile of the major contributor matched that of Edwards, and the DNA profile of the minor contributor was from Unknown Male A. Fishburn then placed the DNA sample of Unknown Male A into a nationwide database.

[8]     Thereafter, in January 2015, Detective David Ellison with the Indianapolis Metropolitan Police Department received information "that there was a potential hit" on the DNA of Unknown Male A. *Id*. at 46. On February 3, Detective Ellison learned that the DNA of Unknown Male A matched Jones' DNA. Accordingly, Detective Ellison interviewed Jones. Jones denied knowing Edwards, and Detective Ellison was unable "to find any connection" between Jones and Edwards. *Id*. However, Detective Ellison discovered that Jones lived "less than a mile and a half" from Edwards at the time of the

murder. *Id*. at 63. And, after he spoke with Jones, Detective Ellison obtained a DNA sample in order to perform a "confirmation swab." *Id*. at 47. Thereafter, Fishburn tested the DNA sample that Detective Ellison had obtained and confirmed that the DNA profile of Unknown Male A matched Jones' DNA profile.

[9] The State charged Jones with murder, a felony (Count 1); felony murder; a felony (Count 2); burglary, as a Class A felony (Count 3); and rape, as a Class A felony (Count 4). The trial court held a jury trial on April 1 through April 3, 2019. Prior to the start of the first day of the trial, the State moved to dismiss Count 3, which motion the trial court granted.

[10] At Jones' trial, the State called Willoughby as a witness. During his testimony, the State moved to admit the oral, vaginal, and anal swabs as evidence. The swabs were in their envelopes, which contained Willoughby's "handwriting on the front, where it came from, the date and the . . . autopsy number," and his initials on the seals. *Id*. Jones stated that he had "[n]o objection" to the admission of that evidence. *Id*. at 3.

[11] On cross-examination, Jones asked Willoughby if, in this particular autopsy, he had taken "three swabs." *Id*. at 4. Willoughby responded: "Yes[.]" *Id*. Jones then asked Willoughby if item M3 "was one oral swab," if item M5 "was one vaginal swab," and if item M7 was "one anal swab." *Id*. at 6, 7. Willoughby responded affirmatively to all three questions. Jones then asked if "the oral swab, anal swab, and vaginal swab" were "the only three swabs [he] took." *Id*.

at 8. Willoughby responded that they were. At that point, Jones had admitted as evidence a copy of Willoughby's laboratory report that detailed the items that Willoughby had collected from Edwards' autopsy. That report identified item M3 as "one (1) oral swab," item M5 as "one (1) vaginal swab," and item M7 as "one (1) anal swab." Ex. at 115.

[12] Joshi also testified at Jones' trial. When she began to testify about her analysis of the swabs, Jones interjected and asked if the envelope that contained the oral swabs was "sealed shut" when she received it. Tr. Vol. III at 95. Joshi stated that it was. Jones also asked if, on the outside of the envelope, "it said oral swab" with "no s." *Id*. at 96. Joshi responded that the envelope was "only marked oral swab." *Id*. Jones then asked if there were four swabs inside of the envelope, to which Joshi responded that there were.

[13] At that point, Jones objected "to any . . . testimony about any testing or analysis of these swabs" because there was an "inaccurate chain of custody" as "it's only been laid a foundation that there was one swab taken, and now we have four swabs in the envelope." *Id*. In response, the State asserted that "those exhibits are sealed with David Willoughby's initials and they are sealed again with Dr. Joshi's initials. There's no indication that those seals have been broken or tampered with, or that anyone else has gotten in those. So as far as the chain of custody, that's been established." *Id*. The trial court overruled Jones' objection.

[14]    The State then proceeded to question Joshi about the swabs. Specifically, the State asked Joshi if she had tested the swabs for seminal material. Joshi testified that she did not identify any semen on the oral swabs but that she found semen on the vaginal and anal swabs. On cross-examination, Jones again questioned Joshi about the evidences she had received from the property room. Jones asked if the envelope that contained the vaginal swabs was labeled as "one vaginal swab." *Id*. at 146. Joshi responded that it was "marked as vaginal swab. They didn't mark how many vaginal swab [sic]. They didn't mark the one vaginal swab, but they marked as vaginal swab." *Id*. When Jones asked if the envelope listed one vaginal swab as the quantity, Joshi responded that "[o]ne means . . . only the one envelope." *Id*. at 147.

[15]    Because of the "issue" that had come up regarding the number of swabs that Willoughby had taken during the autopsy, the State recalled Willoughby as a witness. *Id*. at 165. Willoughby testified that he did not have an independent recollection of having taken the swabs. However, he testified that, "[d]ue to the identification and the correct procedures of the label on it with [his] initials and case number, the date and [his] initials with the evidence seal," he was able to determine that the envelope that contained the four vaginal swabs contained "what [he] collected . . . at the autopsy." *Id*. at 165. Willoughby further testified that the envelope that contained four anal swabs was "in the condition [in] which [he] sealed it with [his] initials, the case number, the date, [and] the autopsy number[.]" *Id*. at 167.

[16]     Jones again cross-examined Willoughby and asked about the number of swabs he had taken and the fact that each envelope listed only one oral swab, one vaginal swab, and one anal swab. Willoughby stated that the label "probably should have . . . had an s, swabs." *Id*. at 171. Willoughby further testified that it is "standard operating procedure" to comingle all swabs taken from one area in the same envelope "regardless of how many swabs you used" as long as they are not comingled with the swabs of another area. *Id*. at 172. In addition, he testified that "the swabs identification on there means that a swabbing was done" and that, "no matter how many swabs per orifice, it's counted as a swabbing." *Id*. at 172, 174.

[17]     The State also presented Fishburn's testimony as evidence. Fishburn testified that the major contributor to the sperm fraction of the DNA from the vaginal swab matched the DNA profile of Jones "and is estimated to occur once in more than 330 billion unrelated individuals," which is the "upper threshold" for their statistics. *Id*. at 192. Fishburn also testified that the minor contributor to the sperm fraction of the anal swab matched Jones' DNA profile.

[18]     At the conclusion of the trial, the jury found Jones guilty of Counts 1 and 4, but not guilty of Count 2. The court entered judgment of conviction accordingly and sentenced Jones to an aggregate sentence of 110 years executed in the Department of Correction. This appeal ensued.

# Discussion and Decision

[19] Jones contends that the trial court abused its discretion when it admitted certain evidence. As our Supreme Court has stated:

> Generally, a trial court's ruling on the admission of evidence is accorded "a great deal of deference" on appeal. *Tynes v. State*. 650 N.E.2d 685, 687 (Ind. 1995). "Because the trial court is best able to weigh the evidence and assess witness credibility, we review its rulings on admissibility for abuse of discretion" and only reverse "if a ruling is 'clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights.'" *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014) (quoting *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013)).

*Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015). On appeal, Jones contends that the trial court abused its discretion when it admitted as evidence the swabs and the subsequent testimony regarding the analysis of those swabs because the State had failed to establish an adequate chain of custody for that evidence.[2]

[20] It is well settled that the State "bears a higher burden to establish the chain of custody of 'fungible' evidence, such as blood and hair samples, whose appearance is indistinguishable to the naked eye." *Troxell v. State*, 778 N.E.2d 811, 814 (Ind. 2002). But an "adequate foundation establishing a continuous

---

[2] The State contends that Jones has waived his argument for our review because he affirmatively stated that he had no objection to the admission of the swabs as evidence. The State is correct that Jones had no objection when the State moved to admit the swabs. However, after Joshi first testified that each envelope contained four swabs instead of one, Jones objected. We assume for the sake of argument that Jones' objection at the time the discrepancy between the number of swabs became apparent was timely and that he preserved the issue for our review.

chain of custody is established if the State accounts for the evidence at each stage from its acquisition, to its testing, and to its introduction at trial." *Espinoza v. State*, 859 N.E.2d 375, 382 (Ind. Ct. App. 2006). "To establish a proper chain of custody, the State must give reasonable assurances that the evidence remained in an undisturbed condition." *Id.*

[21] Jones specifically asserts that the State failed to establish an adequate chain of custody for the vaginal and anal[3] swabs because Willoughby testified that he had collected only one swab from each location on Edwards' body but that Joshi testified that she had received four swabs to test. In essence, Jones contends that the State failed to account for three of the four swabs in each envelope from their acquisition by Willoughby until their testing by Joshi.[4] We cannot agree.

[22] The State readily established a proper chain of custody over the swabs. The record demonstrates that Willoughby took swabs of Edwards' mouth, vagina,

---

[3] Jones also contends that the State failed to establish an adequate chain of custody for the oral swabs. However, Joshi did not find any semen on those swabs. Accordingly, there was no evidence obtained from those swabs that was harmful to Jones' defense and we need not address his argument regarding the oral swabs.

[4] To the extent that Jones' argument is premised on the label on the envelopes, which used "swab" in the singular, as an identifier of the number of swabs within an envelope, that argument is without merit. Willoughby testified that "the swabs identification" on the envelope "means that a swabbing was done." Tr. Vol. III at 172. He further testified that the envelope "should have . . . had an s, swabs." *Id.* at 171. In addition, when asked if the quantity on an envelope listed one swab, Joshi testified that the "[o]ne means . . . only the one envelope." *Id.* at 147. And Joshi testified that, even though one of the envelopes was labeled "vaginal swab," that was not an indication of "how many vaginal swab [sic]." *Id.* at 147. Accordingly, it is clear that the singular use of "swab" on the envelope's label did not denote the number of swabs used but, rather, simply identified that a swabbing of that area had been done.

and anus during her autopsy. He then packaged those swabs in envelopes and wrote his initials over the seals "to ensure that what [he] collected from the autopsy [wa]s what [wa]s contained inside the envelope." Tr. Vol. III at 2. Willoughby then placed the envelopes into the property room, which is a "sealed facility" that can only be accessed by authorized personnel. *Id*. Thereafter, Joshi took the envelopes from the property room and observed that they were "sealed" and "did not show any signs of tampering." *Id*. at 124. When she opened the envelopes, there were four swabs in each envelope.

[23] Further, Willoughby testified that he was able to determine that the envelope with the four vaginal swabs contained "what [he] collected . . . at the autopsy." *Id*. at 165. Additionally, Willoughby testified that the envelope that contained the anal swabs was "in the condition [in] which [he] sealed it with [his] initials, the case number, the date, [and] the autopsy number[.]" *Id*. at 167. And Willoughby testified that it is "standard operating procedure" to comingle all swabs taken from one area "regardless of how many swabs you used" in the same envelope as long as they are not comingled with swabs from another area. *Id*. at 172. Accordingly, despite Jones' assertions, it is clear that the envelopes that Joshi received for testing, which each contained four swabs, were in the same condition that they had been in when Willoughby sealed them.

[24] Any apparent discrepancy between the number of swabs taken was dispelled by Willoughby's testimony, which we have already noted, that "no matter how many swabs per orifice, it's counted as a swabbing." *Id*. at 174. And the number of swabs packaged in each envelope does not affect the ultimate finding

that the evidence collected matched Jones' DNA profile. The evidence supports the conclusion that the protocols for collecting, preserving, and testing the swabs were followed. And there is no question that Willoughby collected and secured the evidence, which was intact when Joshi received it for testing. The chain of custody was uninterrupted.

[25] The State gave reasonable assurances that the swabs remained in an undisturbed condition from their acquisition to their testing. As such, the State established a proper chain of custody for the swabs, and the trial court did not abuse its discretion when it admitted as evidence the swabs or the testimony regarding the analysis of the swabs. We therefore affirm Jones' convictions.

[26] Affirmed.

Vaidik, C.J., and Tavitas, J., concur.